UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| 7-ELEVEN, INC.,<br><br>　　　　　Plaintiff,<br>v.<br><br>HONG KIM,<br><br>　　　　　Defendant. | CIVIL ACTION NO.: 18-cv-4124<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF** |

Plaintiff 7-Eleven, Inc. ("**7-Eleven**") sues Defendant Hong Kim ("**Mr. Kim**") and alleges:

**Parties**

1.　7-Eleven is a corporation organized and existing under the laws of the state of Texas with its principal place of business in Dallas, Texas.

2.　Mr. Kim is an individual residing in and a citizen of Queens County, New York.

**Jurisdiction and Venue**

3.　Subject matter jurisdiction in this matter is founded upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

4.　 The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties to this action are diverse and the amount in controversy exceeds $75,000.00.

5.　Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Mr. Kim operates the business that is the subject of this action in Queens County, New York.

**7-Eleven's System and Registered Marks**

6.　7-Eleven is an operator and franchisor of convenience store retail businesses.

7. 7-Eleven evolved from an ice company that began selling milk, eggs, and bread from an improvised storefront in the 1920s. The company's stores soon became known as "7-Eleven" to reflect the hours of operation – 7 a.m. to 11 p.m. – and that name has been in continuous use for the decades since.

8. 7-Eleven has developed methods and procedures – called a "system" – used in the operation of convenience store businesses. 7-Eleven's system is a comprehensive business format for the establishment and operation of high-standard convenience store businesses with distinctive features in products, services, distribution, accounting, training, and management assistance.

9. 7-Eleven's system is the culmination of decades of 7-Eleven's experience and investment of resources into its development and refinements.

10. To identify the source, origin, and sponsorship of 7-Eleven® convenience stores and the services they offer – and to distinguish its convenience stores and associated products and services from those offered and sold by others – 7-Eleven has extensively used trademarks and service marks (the "**7-Eleven Marks**"), including without limitation:

| Mark | Registration Number | Effective Date |
| --- | --- | --- |
| 7-ELEVEN | 718,016 | 7/4/1961 |
| 7-ELEVEN | 920,897 | 9/21/1971 |
| OH THANK HEAVEN FOR 7-ELEVEN | 1,008,307 | 1/17/1978 |
| SLURPEE | 829,177 | 7/8/1967 |
| BIG GULP | 1,110,172 | 12/26/1978 |
| 7-ELEVEN LOGO AND DESIGN | 896,654 | 8/11/1970 |

11. The 7-Eleven Marks are registered on the Principal Register of the United States Patent and Trademark Office. The registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

12. 7-Eleven has given notice to the public of the registration of the 7-Eleven Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that 7-Eleven and its authorized licensees remain the exclusive users of the 7-Eleven Marks.

13. The 7-Eleven Marks, including the trade dress of red, orange, and green striping against a white field, are often part of the building structure and inseparable from its realty. Even functional components of the equipment used in 7-Eleven® stores, such as fountain backsplashes and its point-of-sale register terminals contain the 7-Eleven® Marks.

14. 7-Eleven has continuously used the 7-Eleven Marks in interstate commerce in connection with the promotion and licensing of 7-Eleven convenience stores and the services they offer throughout the United States, including in the State of New York, since the date of their registration.

15. The services offered by 7-Eleven and its licensees under the 7-Eleven Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including in the State of New York.

16. 7-Eleven has extensively advertised and promoted 7-Eleven® convenience stores and the services they offer under the 7-Eleven Marks throughout the United States and world, expending enormous resources and millions of dollars in advertising and other efforts to obtain and retain recognition and customer association of the 7-Eleven® marks with 7-Eleven® stores and speed, convenience, and quality.

**7-Eleven® Franchising**

17. Through its franchise agreements, 7-Eleven licenses the use of its 7-Eleven Marks and system to independent third parties called "franchisees."

18. Part of 7-Eleven's system are a host of financial services and obligations of the franchisee, the salient features of which include:

A. **The Open Account**: 7-Eleven extends financing to its franchisees for use in the operation of franchised stores. The amount financed by 7-Eleven and the balance due from its franchisee is maintained in an account defined in the franchise agreement as the "Open Account." Essentially, the Open Account is a running working capital account that carries the outstanding balance that 7-Eleven has loaned to the franchisee.

B. **Inventory Reporting & Accounting**: A franchisee can finance its purchase of store inventory through the Open Account or purchase inventory with cash. In either instance, the franchisee is obligated to report the inventory transaction and submit the related invoice to 7-Eleven. 7-Eleven quarterly reconciles the book value of a store's inventory with its audited value quarterly.

C. **Cash Reports**: 7-Eleven® franchisees must prepare and transmit to 7-Eleven a daily cash report ("Cash Report"). Among other things, the Cash Report sets forth daily sales and whether those sales were for cash or credit. The Daily Cash Report also accounts for deductions from cash receipts that affect the daily deposit, such as a franchisee's cash payment to a vendor to acquire merchandise for sale in the store.

D. **Minimum Net Worth**: Most 7-Eleven® franchised stores must maintain a "Minimum Net Worth" of $10,000 or $15,000 depending on the date of their franchise agreement. A franchisee's "Net Worth" is essentially the sum total of its assets minus its liabilities. The Minimum Net Worth requirement is intended to protect 7-Eleven's investment in the store, its exposure for the Open Account, and to assure that a 7-Eleven® franchisee is financially vested in the operation of its store. A franchisee who contributes cash to increase the store's Net Worth reflects that increase on the Cash Report via a "paid-in-capital" contribution.

E. **Monthly Financials**: 7-Eleven prepares monthly financial reports called "**Financial Summaries**" for each store from its bookkeeping records that accumulates and sorts the information reported to it concerning the franchisee's store operations, such as sales, expenses, inventory acquisitions, and paid-in-capital contributions. The Financial Summaries include, among other things, an income statement, balance sheet, and calculation of the Open Account balance and Net Worth calculated in accordance with the provisions of the franchise agreement.

19. In exchange for the benefits of the 7-Eleven® franchise relationship, the franchise agreement obligates the 7-Eleven® franchisee to pay 7-Eleven a defined percentage, roughly 50%, of its gross profit (net sales less the cost of goods sold), called the "7-Eleven Charge."

### The Franchise Agreement with Mr. Kim

20. Mr. Kim has operated 7-Eleven® Store No. 32120, located at 149-52 14th Avenue, in Whitestone, New York 11357 (the "**Store**") for decades.

21. Prior to franchising the Store to Mr. Kim, 7-Eleven had selected its location, leased the property, and made physical improvements to the premises. 7-Eleven also outfitted the Store with equipment for the operation of a convenience store, such as coolers, soda fountains, grills, a safe, cash registers, and so on (the "**Equipment**"). From time to time, 7-Eleven has also made improvements, renovations, and upgrades at the Store's premises, Equipment, and physical plant.

22. Upon expiration of a prior franchise agreement, on September 11, 2015, Mr. Kim and 7-Eleven entered into a new franchise agreement, ancillary agreements, and addenda (collectively, the "**Franchise Agreement**") for the Store. As with the prior franchise agreement, the Franchise Agreement *inter alia* leases (or subleases) the Store's premises, physical plant, and equipment to Mr. Kim for the duration of the Franchise Agreement's term. A copy of the Franchise Agreement is attached as **Exhibit "A".**

### Lottery Commissions

23. For many years, Mr. Kim has sold New York State lottery products from the Store under a license from the New York Lottery and Gaming Commission.

24. Mr. Kim has received from the New York Lottery and Gaming Commission a commission from the sale of lottery products at the Store that is a defined percentage (6%) of the

sales of lottery products. For example, if Mr. Kim sells $1000 in lottery products, his commission would be $60.00.

25.  Per the Franchise Agreement, those commissions are in turn included in the Store's "Net Sales" (as that term is used in the Franchise Agreement) from which the aforementioned 7-Eleven charge is derived. In this fashion, as with merchandise sales, the franchisee is required to report to 7-Eleven his or her receipt of lottery commission payments and pay to 7-Eleven a percentage of the commissions from the sale of a lottery ticket.

26.  To properly account-for and inform 7-Eleven of the receipt of a lottery commission, a franchisee must first include the lottery commissions in the "sales" of the Store by making an entry on the Point of Sale system ("**POS**"), which is a touch-screen register at the Store's sales counter, and then a corresponding, equivalent entry on Store's daily Cash Report at the time the Cash Report is prepared on the back-office computer, also called an In-Store-Processor or ISP.

27.  The Cash Report is, *inter alia*, designed to accumulate information from a store's POS systems so that the franchisee may accurately account to 7-Eleven for the Store's daily transactions and reconcile the cash on hand with the cash reported as collected by the POS system. In this fashion, among other things, the Store's daily bank deposit amount is calculated.

28.  If a franchisee enters a greater amount as a lottery commission on the Cash Report than has been entered on the ISP or makes a "0" or no entry on the POS, the Store's merchandise sales, as reported to 7-Eleven, are decreased by the difference.

29.  To illustrate, if the franchisee's cash merchandise sales for a particular day are $4,000 and the franchisee receives $500 in lottery commissions (corresponding to 6% of $8,333.33 in lottery sales) the bank deposit amount should total $4,500. However, if the franchisee takes no action with respect to entering the amount of commissions on the POS

system whereas a (greater) amount of $500 is entered for the Cash Report, $500 in merchandise sales are mischaracterized as lottery commissions, or, put another way, this causes the Store to underreport merchandise sales to 7-Eleven by $500.

### Mr. Kim's Scheme of Lottery Commission Fraud

30. For more than four years, Mr. Kim has systematically misrepresented to 7-Eleven the inclusion of lottery commissions receipts in the Store's daily Cash Reports. In fact, while Mr. Kim has technically reported lottery commissions he has received accurately, he has failed to record the receipt of those commissions on the POS system thereby causing merchandise sales to be improperly characterized as lottery commissions and fraudulently decreasing the reported merchandise sales to 7-Eleven. Thus, Mr. Kim's *modus operandi* is to record the receipt of lottery commissions on the Store's daily Cash Reports but make no equivalent entry on the Store's POS system, which causes the underreporting of merchandise sales to 7-Eleven in the amount of the lottery commission receipts stated in the Cash Report.

31. If Mr. Kim were to have included the physical (cash or check) lottery commission receipts in the cash proceeds that are counted alongside preparation of the Store's daily Cash Reports, Mr. Kim would have recorded hundreds of days of cash overages (an excess of cash accounted-for by the POS system) in the amount equal to the lottery commissions reported to 7-Eleven via the daily Cash Reports, which did not occur.

32. Again, through his perfidy, Mr. Kim has caused the Store's merchandise sales as reported to 7-Eleven to be decreased by the amount of the lottery commissions as reported on the Cash Report because he made no equivalent entry of the receipt of lottery commissions on the Store's POS system.

33. For example, during December of 2017, Mr. Kim reported via the Store's Cash Reports multiple days of having received lottery commissions totaling $9,477.00. However, Mr.

Kim recorded zero ($0.00) lottery commissions throughout the month of December 2017 on the POS system. Thus, during December of 2017, Mr. Kim's fraudulent scheme caused $9,477.00 ($9,477.00 - $0.00) in merchandise sales that should have been reported to 7-Eleven to be mischaracterized as lottery commissions.

34. In the fashion described above, Mr. Kim has underreported at least **$369,335.00** in merchandise sales between January of 2014 and February of 2018 to 7-Eleven by causing those merchandise sales to be reported as lottery commissions.

## Mr. Kim's Inventory Manipulation

35. Mr. Kim's lottery commission reporting scheme should have caused substantial inventory shortages to be detected by the quarter-annual physical-count inventory audits performed by a third-party auditor at the Store. These audits should have revealed a substantial variance (inventory shortage) when comparing the actual inventory count and the book inventory value as calculated by reported merchandise sales and other merchandise inventory adjustments reported by the Store.

36. Mr. Kim, however, concealed his above-described lottery commission fraud by acquiring Inventory without reporting it to 7-Eleven or by artificial inflation of the Store's book inventory value to lessen or eliminate the merchandise inventory variance (shortage) that should have been detected upon the physical inventory counts.

37. Put another way, the periodic physical audits of the Store should have revealed inventory shortages of at least the cost value of the merchandise sold in the hundreds of thousands of dollars in underreported sales but the results of those audits were instead inventory shortages in far lesser amounts.

38. For example, during just the calendar 2017, Mr. Kim caused the underreporting of $104,109.00 in merchandise sales at the Store via the above-described lottery commission

scheme. Even assuming no loss (often called "shrinkage" in the retail industry) from theft, the Store's periodic audits attributable to 2017 should have revealed at least $104,109.00 in merchandise valued at retail (or $74,437.94) at cost. However, the actual inventory counts at Mr. Kim's Store revealed a shortage of just $15,358.99 at cost. This means that the Store should have had an inventory overage of at least $59,078.95 attributable to 2017, but due to the manipulation of the inventory value, the audits detected no such overage.

### Harm to 7-Eleven

39. 7-Eleven relied on Mr. Kim's misrepresentations and included his false information in the Store's Bookkeeping Records, using that information to calculate, among other things, the Store's Net Worth and Open Account balance.

40. Mr. Kim's misrepresentations deprived 7-Eleven of its full 7-Eleven Charge, that is, its share of the Store's Gross Profit on the underreported merchandise sales.

41. In addition, the Store's financial records reflect grossly-overstated costs of goods sold because of Mr. Kim's inventory manipulation activities, which in turn has understated the Store's reported Gross Profit on which the 7-Eleven Charge is calculated.

42. In sum, through February of 2018, Mr. Kim's fraudulent scheme caused $369,335.00 in merchandise sales to be mischaracterized as lottery commissions when reported to 7-Eleven. Adjusting for Mr. Kim's inventory manipulation, this underreporting of sales has in turn deprived 7-Eleven of more than $159,000.00 of its 7-Eleven Charge while unjustifiably enriching Mr. Kim in at least that amount.

### Termination of the Franchise Agreement

43. On July 18, 2018, 7-Eleven delivered to Mr. Kim a Non-Curable Notice of Material Breach and Termination ("**Notice of Termination**"). A copy of the Notice of Termination is attached as **Exhibit "B."** Included within Exhibit B is an itemization of the

lottery commissions as reported by Mr. Kim and as reported by the POS system through February of 2018, showing the calculation of $369,335.00 in underreported merchandise sales over a period of four years between January of 2014 and February of 2018.

44. 7-Eleven terminated the Franchise Agreement immediately and without opportunity to cure because the lottery commission practices uncovered by 7-Eleven are willful and fraudulent, violate the fundamental purpose of the Franchise Agreement, go to the core of the franchise relationship between 7-Eleven and Mr. Kim, and destroy the trust essential to any functional, continuing business relationship as contemplated by the Franchise Agreement.

45. Via the Notice of Termination, 7-Eleven declared Mr. Kim's sublease and the Equipment lease terminated and demanded that Mr. Kim comply with his post-termination obligations under the Franchise Agreement, including that he quit the premises and deliver possession to 7-Eleven and transfer the Store's Inventory to it.

46. By separate notice attached to the Notice of Termination, 7-Eleven also discontinued its financing of the Open Account and, per the terms of the Franchise Agreement, accelerated and declared immediately due and payable it entire balance, which amount as of July 18, 2018 was $13,945.52.

47. Although Mr. Kim was presented with the Notice of Termination on July 18, 2018, and given an opportunity to read and consider it, he ripped up the Notice of Termination and left it in pieces on the conference room table after meeting with 7-Eleven.

### Mr. Kim's Violation of Post-Termination Covenants and Infringement

48. Notwithstanding the Franchise Agreement's termination and 7-Eleven's demands for possession of the Store's premises and Equipment, Mr. Kim continues to operate from the Store's premises a retail convenience store business, falsely holding out that business to the consuming public as an authorized and duly licensed 7-Eleven® store.

49. To protect itself, 7-Eleven has advised its vendors that the store operated by Mr. Kim is no longer a 7-Eleven®, despite its appearance otherwise, and that Mr. Kim is not authorized to carry or purchase 7-Eleven's proprietary brands.

50. The Store's condition and operations will deteriorate as time progresses because Mr. Kim cannot comply with 7-Eleven's system.

51. There is no reasonable way for a customer to know that Mr. Kim's store is not authorized to use 7-Eleven's marks and is not associated with the 7-Eleven® system. By all appearances, the Store remains, and its premises appear to be, a 7-Eleven® store, although it is not.

52. It is impractical if not impossible for Mr. Kim to sufficiently separate the distinguishing characteristics of the Store from 7-Eleven. Consequently, unless Mr. Kim is prohibited from continuing his operations, 7-Eleven's brand and image are at risk and will be impaired by a customer's negative views and association of experiences at the Store's location with the 7-Eleven® brand.

53. 7-Eleven is prevented from making productive use of its own property as a consequence of Mr. Kim's conduct. In particular, Mr. Kim has no right of continued possession of the premises or Equipment following termination of the Franchise Agreement.

54. All conditions precedent to bringing this suit have occurred, have been satisfied, or have been waived.

**COUNT I -- BREACH OF CONTRACT – POST-TERMINATION OBLIGATIONS**

55. 7-Eleven realleges paragraphs 1 through 54 of its Complaint as if fully set forth herein.

56. Upon termination of the Franchise Agreement, Mr. Kim was obligated, among other things, to:

      a.      surrender the Store's premises to 7-Eleven;

      b.      surrender all 7-Eleven equipment;

      c.      immediately cease using the 7-Eleven Marks and all elements of the 7-Eleven System;

      d.      transfer to 7-Eleven the Receipts, Cash Register Fund, prepaid Operating Expenses, money order blanks, bank drafts, lottery tickets and store supplies to 7-Eleven;

      e.      refrain from engaging in any "**Competitive Business**", which is a business the same as or similar to a 7-Eleven® store, including a convenience store or other store with a product mix of fifty percent or more of goods or services substantially similar to a 7-Eleven Store, for a period of one year at the site of the Store or any other former 7-Eleven store within two years of it last being operated as a 7-Eleven store; and

      f.      return all Trade Secrets and Confidential Information to 7-Eleven.

57. Mr. Kim has failed and refused to comply with his post-termination obligations, materially breaching the Franchise Agreement.

58. As a direct and proximate result Mr. Kim's breaches of his post-termination obligations, 7-Eleven has been irreparably injured, including injury to its goodwill and reputation, as well as being deprived of its ability to utilize its property for which 7-Eleven is without an adequate remedy at law.

## COUNT II -- BREACH OF CONTRACT – DAMAGES

59. 7-Eleven realleges paragraphs 1 through 58 of its Complaint as if fully set forth herein.

60. In the Franchise Agreement, Mr. Kim agreed to:

-12-

a. cause all sales of inventory to be properly recorded at the time of sale;

b. prepare and furnish to 7-Eleven daily reports of Purchases;

c. provide 7-Eleven with truthful, accurate and complete information in compliance with all applicable laws and such policies that 7-Eleven implemented from time to time;

d. pay all sales, payroll and income taxes with regard to the operation of the store;

e. only take draws when financially appropriate in accordance with the procedures contained in the Franchise Agreement;

f. maintain a high ethical standard in the conduct of the franchised business and in the operation of the Store;

g. not commit any act which may adversely affect or be detrimental to 7-Eleven, other 7-Eleven franchisees, the 7-Eleven Image or the 7-Eleven System (as defined in the Franchise Agreement);

h. devote his best efforts to the business of the Store and maximization of the Store's sales and gross profit, and cause the Store to be operated only pursuant to the 7-Eleven System and in a manner that will enhance the 7-Eleven Image; and

i. pay his open account balance upon the discontinuance of 7-Eleven's financing.

61. Mr. Kim breached these obligations, causing 7-Eleven to suffer damages in an amount to be determined at trial.

## COUNT III -- LANHAM ACT - TRADEMARK INFRINGEMENT

62. 7-Eleven realleges paragraphs 1 through 61 of its Complaint as if fully set forth herein.

63. Mr. Kim's acts, practices and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Mr. Kim's sale, offering for sale, distribution or advertising of goods and services under the 7-Eleven Marks, or any designs similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l).

64. As a direct and proximate result of Mr. Kim's infringement, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

65. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Mr. Kim's misconduct.

66. Unless enjoined by the Court, Mr. Kim will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Mr. Kim's continued use of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT IV -- LANHAM ACT – TRADEMARK DILUTION

67. 7-Eleven realleges paragraphs 1 through 66 of its Complaint as if fully set forth herein.

68. Mr. Kim's acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the 7-Eleven Marks, and Mr. Kim's sale, offering for sale, distribution or advertising of non-conforming goods under the

7- Eleven Marks causes dilution of the distinctive quality of the 7-Eleven marks, in violation of 15 U.S.C. § 1125(c).

69. As a direct and proximate result of Mr. Kim's infringement, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits, and diminished goodwill.

70. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation, and goodwill, such that damages alone cannot fully compensate 7-Eleven for Mr. Kim's misconduct.

71. Unless enjoined by the Court, Mr. Kim will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill, and reputation requires injunctive relief to prevent Mr. Kim's continued dilution of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## **COUNT V -- LANHAM ACT - UNFAIR COMPETITION**

72. 7-Eleven realleges paragraphs 1 through 71 of its Complaint as if fully set forth herein.

73. Mr. Kim's acts, practices, and conduct constitute unfair competition, false designation of origin and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

74. As a direct and proximate result of Mr. Kim's unfair competition, 7-Eleven has been and is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

75. 7-Eleven has no adequate remedy at law because the 7-Eleven Marks are unique and represent to the public 7-Eleven's identity, reputation and goodwill, such that damages alone cannot fully compensate 7-Eleven for Mr. Kim's misconduct.

76. Unless enjoined by the Court, Mr. Kim will continue to use and infringe the 7-Eleven Marks, to 7-Eleven's irreparable injury. This threat of future injury to 7-Eleven's business identity, goodwill and reputation requires injunctive relief to prevent Mr. Kim's continued use of the 7-Eleven Marks and to ameliorate and mitigate 7-Eleven's injuries.

## COUNT VI -- BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

77. 7-Eleven realleges paragraphs 1 through 76 of its Complaint as if fully set forth herein.

78. The Franchise Agreement contained an implied covenant of good faith and fair dealing.

79. Mr. Kim, by his behavior, breached this covenant.

80. As a result of Mr. Kim's breaches, 7-Eleven has suffered damages in an amount to be determined at trial.

## COUNT VII -- RECOVERY OF POSSESSION OF PREMISES

81. 7-Eleven realleges paragraphs 1 through 80 of its Complaint as if fully set forth herein.

82. 7-Eleven subleased the Store premises to Mr. Kim under the Franchise Agreement. By the terms of the sublease contained in the Franchise Agreement, 7-Eleven granted Mr. Kim possession of the premises for ten years unless the Franchise Agreement terminated sooner.

83.     On July 18, 2018, 7-Eleven delivered the Notice of Termination to Mr. Kim, terminating the Franchise Agreement along with Mr. Kim's lease of the Store's premises and demanding forthwith possession of the same.

84.     Mr. Kim has refused to surrender possession of the Store premises.

## COUNT VIII -- REPLEVIN

85.     7-Eleven realleges paragraphs 1 through 84 of its Complaint as if fully set forth herein.

86.     7-Eleven owns the Equipment and pursuant to the Franchise Agreement, leased the Equipment to Mr. Kim.

87.     Under the Franchise Agreement, Mr. Kim granted to 7-Eleven a security interest in and a lien on all Goods, including Equipment, Fixtures, and Inventory, and all proceeds thereof held or maintained at the Store or used in the ownership and operation of the Store.

88.     Upon termination of the Franchise Agreement, Mr. Kim has no right to continue to use or possess the Equipment. Despite 7-Eleven's demands, Mr. Kim is wrongfully detaining the Equipment.

89.     To the best of 7-Eleven's knowledge, information, and belief, the above described property is located at the Store and valued at not less than $225,000.

## PRAYER FOR RELIEF

**WHEREFORE**, 7-Eleven respectfully prays for the following relief against Defendant Hong Kim ("**Mr. Kim**"):

(A)     A preliminary and permanent injunction directing that Mr. Kim surrender possession of and be ejected from the premises and facilities at 149-52 14th Avenue, Whitestone, New York 11357 and that 7-Eleven be placed in possession of the same;

(B)     A preliminary and permanent injunction enjoining Mr. Kim, his agents, servants and employees and those people in active concert or participation with him, from:

    1.    Using the 7-Eleven Marks or any trademark, service mark, logo or trade name that is confusingly similar to the 7-Eleven Marks;

    2.    Otherwise infringing the 7-Eleven Marks or using any similar designation, alone or in combination with any other components;

    3.    Passing off any of their products or services as those of 7-Eleven or 7-Eleven's authorized franchisees;

    4.    Causing a likelihood of confusion or misunderstanding as to the source or sponsorship of his businesses, products or services;

    5.    Causing a likelihood of confusion or misunderstanding as to their affiliation, connection or association with 7-Eleven and its franchisees or any of 7-Eleven's products or services;

    6.    Operating a Competitive Business from the site of the Store for an uninterrupted period of one (1) year following termination of the Franchise Agreement;

    7.    Unfairly competing with 7-Eleven or its franchisees, in any manner;

(C) An order pursuant to 15 U.S.C. § 1118 that all labels, signs, prints, packages, receptacles, logo items, and advertisements, bearing the 7-Eleven Marks, in the possession of Mr. Kim, their agents, servants and employees, and those people in active concert or participation with them, be delivered to 7-Eleven at Mr. Kim's cost;

(D) An order requiring Mr. Kim to account for and pay over to 7-Eleven all gains, profits and advantages derived by him as a result of their infringement of the 7-Eleven Marks and unfair competition to the full extent provided for by Section 35 of the Lanham Act, 15 U.S.C. § 1117, and by the controlling principles of common law;

(E) A judgment in favor of 7-Eleven and against Mr. Kim for the damages 7-Eleven has incurred because of Mr. Kim's breach of the Franchise Agreement;

(F) A judgment in favor of 7-Eleven and against Mr. Kim for such damages as 7-Eleven has sustained by reason of Mr. Kim's trademark infringement and unfair competition; and that, because of the willful nature of said infringement, the Court enter judgment for 7-Eleven for three times the amount of said damages, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117;

(G) An order directing Mr. Kim to surrender to 7-Eleven all signs, marketing materials or other materials containing any of the 7-Eleven Marks;

(H) An order requiring Mr. Kim be required to file with the Court and to serve upon 7-Eleven's counsel within ten (10) days after entry of any injunction or order issued, a written

report, under oath, setting forth in detail the manner in which he has complied with such injunction or order;

(I) A judgment in favor of 7-Eleven and against Mr. Kim for the costs and expenses, including reasonable attorneys' fees, incurred by 7-Eleven in connection with this action as provided for by contract or statute; and

(J) Such further and other relief as the Court deems just and appropriate.

Dated: July 19, 2018 **7-ELEVEN, INC.**

By its attorneys,

/s/ *Michael A. Troisi*
Michael A. Troisi (MAT – 2002)
RIVKIN RADLER, LLP
926 RXR Plaza, Uniondale, NY 11556-0926
Telephone: 516.357.3000
michael.troisi@rivkin.com

*Of Counsel*

Christian C. Burden
QUARLES & BRADY LLP
101 E. Kennedy Blvd., Suite 3400
Tampa, Florida 33602
Telephone 813. 387.0300
chris.burden@quarles.com